NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0019n.06
Filed: January 9, 2006

**No. 04-2370**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

RANDY JOOSTBERNS,

     **Plaintiff-Appellant,**

v.

UNITED PARCEL SERVICES, INC.,

     **Defendant-Appellee.**

                             /

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN**

**BEFORE:**    **CLAY and COOK, Circuit Judges; OLIVER, District Court Judge.**[*]

    **CLAY, Circuit Judge.**  Plaintiff Randy Joostberns appeals an October 6, 2004 order of the district court granting Defendant United Parcel Service, Inc.'s ("UPS") motion for summary judgment and dismissing Plaintiff's claims against UPS under the Family and Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), and Michigan's Persons With Disabilities Civil Rights Act ("PWDCRA"). For the reasons set forth below, we **AFFIRM** the order of the district court.

**I.
BACKGROUND**

---

[*]The Honorable Solomon Oliver, Jr., United States District Court Judge for the Northern District of Ohio, sitting by designation.

A.      **Procedural History**


On July 24, 2003, Plaintiff Randy Joostberns filed a complaint in the United States District Court for the Western District of Michigan alleging that Defendant UPS terminated him in violation of the FMLA, ADA and Michigan PWDCRA. Plaintiff subsequently filed an amended version of his complaint. Thereafter, on July 14, 2004 Defendant moved for summary judgment. In response, Plaintiff submitted a brief with exhibits. The exhibits included an affidavit from UPS employee Patrick Frost. Defendants then moved to strike the affidavit of Patrick Frost attached to Plaintiff's brief. Plaintiff responded, and on September 27, 2004 the district court held a hearing on Defendant's motions for summary judgment and to strike the Frost Affidavit. On October 6, 2004, the district court granted Defendant's motion for summary judgment on all of Plaintiff's claims and denied Defendant's motion to strike as moot. Plaintiff timely filed a notice of appeal on November 2, 2004.

B.      **Substantive Facts**

Plaintiff Randy Joostberns began working as a truck washer for UPS in 1984 while attending community college. After graduating, Plaintiff became a truck loader, and in 1986 he became a truck driver. Plaintiff remained a driver until May of 2001.

In 1999, however, Plaintiff began to experience family and personal problems that required him to take significant amounts of leave. Plaintiff's daughter, Jennifer, was diagnosed with depression and anorexia nervosa. She was hospitalized in April of 1999 and thereafter remained in

outpatient care for one month. Plaintiff took time off work to participate in Jennifer's treatment, which included individual and family therapy.

Jennifer's health did not improve, and in 2001 she twice attempted suicide. Her first attempt occurred in early 2001. Following the attempt, Jennifer was placed in a treatment center in Arizona. Plaintiff took one week off work to visit Jennifer in Arizona. Her second attempted suicide occurred soon after she returned from Arizona. After her second attempt, Jennifer was placed in a facility in Wisconsin.

Due to Jennifer's mental health problems, Plaintiff developed severe depression. According to Plaintiff, his depression caused him to forget assignments and become lost and confused while driving. Consequently, Plaintiff applied for leave under the FMLA. Defendant UPS granted Plaintiff's leave, and Plaintiff left work at UPS for treatment in early May 2001.

Plaintiff returned to work in early July 2001. He informed his supervisors that his prescription medication contained a warning label advising persons not to operate heavy machinery while medicated. His supervisors placed him at the UPS customer counter and did not reinstate him to his former position as a driver. According to UPS management and supervisors, Plaintiff requested the customer counter position. Plaintiff denies making this request.

On or before July 2, 2001, Chris Smith, a UPS employee, received a tip that Plaintiff was shipping packages without paying for them. Smith passed this information on to Philip Siegel in UPS's security department. Siegel recorded notes from his conversation with Smith in his planner and thereafter investigated the tipster's allegations. By looking at tracking information in the UPS system, Siegel determined that there was no record of payment for six packages shipped to

3

Wisconsin. Siegel did not print out the tracking information, but copied the information into his investigation report. Subsequently, Siegel discarded the notes in his planner pursuant to his regular practice of discarding his notes every sixty days. He claims that UPS did not instruct him to discard his notes on a regular basis. The UPS tracking system erases tracking information after eighteen months.

On July 29, 2001, at approximately 9:00 a.m., Siegel met with Plaintiff to discuss the results of his investigation. Seigel testified that Plaintiff, Plaintiff's supervisor Dan Langdon, and union steward Mike Garcez attended the meeting. According to Siegel's investigation report, Siegel asked Plaintiff if he recognized the Wisconsin address, to which the unpaid shipments were delivered. Plaintiff admitted that he recognized the address as that of the hospital in which his daughter was currently residing for treatment purposes. Siegel informed Plaintiff that UPS did not have customer counter receipts for the shipments and that the lack of receipts indicated that Plaintiff had not paid for the shipments. Plaintiff asked if he could pay for the packages at that time. Siegel informed him that it was too late.

The meeting ended around 10:00 a.m. Thereafter, Plaintiff left to search for copies of shipment receipts. He returned with two receipts, and at 3:00 p.m. met with Siegel, Langdon, and Smith for a second time. This time, UPS employees Patrick Frost and Tom Hardy attended the meeting with Plaintiff. Mike Garcez did not attend. Langdon informed Plaintiff that he was suspended pending the investigation. The next day, Langdon informed Plaintiff that he was terminated. Mr. Langdon denies that he was involved in the decision to terminate Plaintiff.

After his termination, Plaintiff found a third receipt. According to UPS, however, Plaintiff's receipts to not prove that he paid for the shipments because they are not stamped as paid. Plaintiff contests UPS's claim that the receipts do not prove payment. It is undisputed, however, that Plaintiff could not find receipts for three of the packages although he maintains that he paid for all six shipments.

Plaintiff contested the legality of UPS's decision to terminate him through Union grievance procedures. In November 2001, the Michigan Teamsters UPS Joint Grievance Committee upheld UPS's termination of Plaintiff. One and a half years later, Plaintiff filed suit in federal court alleging that his termination violated the FMLA, the ADA and the PWDCRA.

## II.
### Discussion

**A.      Standard of Review**

This Court reviews a district court's grant of summary judgment *de novo*. *Blackmore v. Kalamazoo*, 390 F.3d 890, 894-95 (6th Cir. 2004). Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56 (c). The party bringing the summary judgment motion bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may satisfy its burden by offering affirmative evidence that negates an element of the non-moving party's claim or by pointing to an absence of evidence to support the non-moving party's claim. *Id.* If the moving party satisfies its burden, the non-moving party must then set forth the specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257-58 (1986).

In evaluating the evidence, this Court draws all reasonable inferences in favor of the non-moving party. *Blackmore*, 390 F.3d at 895 (citing *Matsushita Elec. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). Additionally, this Court does not weigh the evidence or make credibility determinations. *Id.* (citing *Anderson*, 477 U.S. at 249). The existence of a mere scintilla of evidence in support of the non-moving party's position, however, will be insufficient to survive summary judgment. *Anderson*, 477 U.S. at 251. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Id.* at 250-51.

**B.      FMLA Claim**

Plaintiff asserts that Defendant violated the FMLA when Defendant failed to reinstate Plaintiff to the position of driver after Plaintiff returned from FMLA authorized leave, when Defendant commenced an investigation into his shipment of packages, and when Defendant terminated Plaintiff from employment. For the reasons set forth below, this Court affirms the decision of the district court granting Defendant's motion for summary judgment on all Plaintiff's FMLA claims.

**1.      Reinstatement**

The district court properly dismissed Plaintiff's reinstatement claim in response to Defendant's motion for summary judgment because Plaintiff failed to properly plead the claim and because the FMLA did not require Defendant to reinstate Plaintiff to the position of driver.

**a.      Failure to Adequately Plead**

Plaintiff fails to state a claim under the FMLA based upon Defendant's failure to reinstate Plaintiff because Plaintiff failed to plead a claim based upon reinstatement in his complaint. Federal

Rule of Civil Procedure 8 governs pleading in federal court. The pleading standard articulated in Rule 8 is a low standard. A plaintiff need only give the defendant "fair notice" of the plaintiff's claims. Fed. R. Civ. Pro. 8(a). Fair notice consists of "what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 512 (2002). In this case, Plaintiff's complaint did not once mention Defendant's failure to reinstate Plaintiff. Thus, Plaintiff did not give Defendant "fair notice" of his reinstatement claim.

Plaintiff's reliance on his allegations that Defendant violated FMLA's "prescriptive protections" in order to satisfy Rule 8's pleading standard for his claim based on reinstatement must be rejected. Plaintiff's legal argument is based on a distinction between two types of provisions contained in the FMLA: prescriptive and proscriptive. According to Plaintiff, prescriptive provisions confer substantive rights, whereas proscriptive provisions prohibit retaliation for exercise of the prescriptive substantive rights. Plaintiff argues that because the termination was retaliatory, and thus, "proscriptive," Defendant was on notice that Plaintiff was alleging violations of other "prescriptive" provisions, including failure to reinstate.

There are several problems with this argument. First, Plaintiff's complaint mentioned two incidents that potentially gave rise to claims under the FMLA: (1) Plaintiff's termination; and (2) Defendant's denial of medical insurance coverage for Plaintiff's daughter's treatment. In particular, improper denial of medical coverage was not alleged to be retaliatory, and thus, potentially violated a "prescriptive" and not "proscriptive" provision. Consequently, Defendant had no reason to suspect that the reference to "prescriptive protections" in the complaint referred to an incident outside the complaint.

Second, Plaintiff's complaint expressly states, "the above acts and omissions violated both the prescriptive protections guaranteed to Plaintiff under the FMLA, as well as the proscriptive provisions of the FMLA." Plaintiff's complaint thus makes clear that the prescriptive violations alleged were based on the termination and denial of coverage described in the preceding paragraphs, as opposed to a basis not explicitly addressed in the complaint.

Third, even if neither the denial of coverage nor the termination constituted "prescriptive" protections as opposed to "proscriptive" protections, Defendant would still not be on notice that the reinstatement was an issue. Plaintiffs routinely make claims that defendants believe have no basis in the law. Therefore, a defendant is not on notice that a plaintiff intends to base its claims on incidents not mentioned in the complaint simply because a defendant believes that the legal theory articulated in a complaint is inapplicable to the facts set forth in the complaint.

Finally, the policy considerations underlying notice pleading support dismissal of this claim. One purpose of notice pleading is to allow plaintiffs to sue defendants before they have all the facts and use discovery to strengthen their claims. *See Swierkiewicz*, 534 U.S. at 512 (discussing the relationship between discovery and pleading under Federal Rules). Allowing plaintiffs to develop their claims during discovery is often necessary because the defendant may have access to substantially more information surrounding the events in issue than the plaintiff. In this case, however, Plaintiff knew that he was not reinstated. If Plaintiff believed this to be an issue, nothing prevented him from mentioning it in his complaint or his amended complaint. Plaintiff's failure to mention the reinstatement claim prejudiced Defendant during the briefing process. Defendant failed to address the reinstatement claim in its motion for summary judgment presumably because

8

Defendant was not aware of its existence. To allow Plaintiff's claim to stand despite this prejudice would not do substantial justice. *See Conley v. Gibson*, 355 U.S. 41, 48 (1957); nor would the lack of adequate briefing facilitate a decision on the merits. *See id.* ("The Federal Rules . . . accept the principle that the purpose of pleading is to facilitate a decision on the merits.")

### b.    Merits

Even if Plaintiff had properly pled his reinstatement claim, this Court would reject the claim on its merits. The FMLA does not require employers to reinstate an employee if the employee is no longer able to perform his or her former job. 29 C.F.R. § 825.214(b). Defendant argues that Plaintiff was medicated when he came back to work and that the medication warned against operating heavy machinery while medicated.[1] Therefore, Defendant did not have an obligation to reinstate Plaintiff to the position of driver. Defendant's argument finds strong support in the record, in particular in Plaintiff's own deposition.

Q.    When you went back to work in July 2001, where you under, at that time, any work restrictions?

A.    Just on the medication.

Q.    Did the fact that you were on the medication provide or prevent you from performing your work as a driver on your bid route?

A.    I actually went to the supervisor, which I believe, I'm not – I can't tell you who it was, whether it was Rick or Jim. I believe it was Rick Smigiel and I just mentioned – and I eventually went to Dan Landon and told him of my

---

[1] Defendant also argues that the record suggests that Plaintiff requested not to be a driver and that Plaintiff does not recall whether or not he was reinstated to the position of driver when he returned. Both these arguments are meritless. Plaintiff stated in his deposition that he did not request to work at the counter and that he worked at the counter when he returned. This Court cannot accepted Defendant's version of contested facts on summary judgment.

concern that the medication I was on, said on the label, "Do not operate heavy machinery while under or taking this medication," whatever the label says on there.

Q. For Zoloft?

A. I don't recall.

Q. Did any of your treaters tell you that you couldn't operate a truck for UPS in July of 2001?

A. I don't recall.

(J.A. at 93.)  Because Defendant produced evidence clearly demonstrating that Plaintiff was not entitled to be reinstated under FMLA, the burden of proof on summary judgment shifted to Plaintiff to offer evidence to the contrary.  *Anderson*, 477 U.S. at 257-8.    Plaintiff fails to respond to Defendant's argument in his brief.[2]    Therefore, the district court's decision to grant summary judgment on this issue was proper.

**2.      Termination**

The district court properly dismissed Plaintiff's FMLA claim based on termination because Plaintiff failed to meet his burden of production under the *McDonnell Douglas* standard.  Plaintiff has failed to produce sufficient evidence to create a genuine issue of material fact as to whether Defendant's articulated reason for terminating Plaintiff was pretextual.

**a.      The FMLA &amp; *McDonnell Douglas* Framework**

---

[2]Plaintiff does state in his deposition that he believes he was capable of driving.  Plaintiff did not discuss this in his brief at all.  In any case, if Plaintiff had properly raised this issue, Defendant would still be able to rely on the honest belief rule discussed below.

"The FMLA entitles an eligible employee to as many as twelve weeks of leave during any twelve-month period if he or she has a 'serious health condition' that makes the employee unable to perform the function of the position of such an employee." *Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309, 314 (6th Cir. 2001) (citing 29 U.S.C. § 2612(a)(1)(D)). It also prohibits employers from retaliating against employees for exercising the right to take FMLA authorized leave. *Id.* To establish a *prima facie* case for retaliation under FMLA, a plaintiff must establish: (1) that he or she availed himself of a protected right under the FMLA; (2) that he or she was adversely affected by an employment decision; and (3) that a causal connection exists between the exercise of the protected right and the adverse employment decision. *Id.*

Where a plaintiff's showing of the third element – causal connection – is based on indirect evidence, courts employ the burden shifting analysis developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Skrjanc,* 272 F.3d at 315. Indirect evidence is evidence that requires the "factfinder to draw any inference in order to conclude that the challenged [] action was motivated at least in part by [illegal considerations]." *DiCarlo v. Potter*, 358 F.3d 408, 415 (2004). Under *McDonnell Douglas*, once a plaintiff offers sufficient indirect evidence to support a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. 411 U.S. at 802-03. Indirect evidence is sufficient to support a *prima facie* case if the evidence is "sufficient to raise the inference that [the] protected activity was the likely reason for the adverse [employment] action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000).

11

If the employer articulates a legitimate reason for its action, the burden of production shifts back to the plaintiff to demonstrate that the employer's reason is pretextual. There are three primary methods by which plaintiffs generally show pretext: by showing that the proffered reason, (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998); *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

The first method is essentially an attack on the credibility of the employer's proffered reason. *Manzer*, 29 F.3d at 1084. It consists of showing that the employer did not actually have cause to take adverse action against the employee based on its proffered reason, and thus, that the proffered reason is pretextual. *Id.* Where the employer can demonstrate an honest belief in its proffered reason, however, the inference of pretext is not warranted. *See Smith*, 155 F.3d at 806. Thus, this Circuit has adopted the "honest belief rule." *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001); *Smith*, 155 F.3d at 806-07. Under the honest belief rule, an employer's proffered reason is considered honestly held where the employer can establish it "reasonably reli[ed] on particularized facts that were before it at the time the decision was made." *Id.; see also Majewski*, 274 F.3d at 1117. Thereafter, the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held. *Smith*, 155 F.3d at 807. An employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact. *Majewski*, 274 F.3d at 1117.

Similarly, the second method is an attack on the credibility of the employer's proffered reason. *Manzer*, 29 F.3d at 1084. Unlike the first method, the second method admits that the employer's proffered reason has basis in fact but denies that it created sufficient cause for the adverse employment action. *Id.* It "ordinarily consists of evidence that other employees . . . were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.*

In contrast, the third method – demonstrating that the proffered reason did not actually motivate the employer – does not attack the credibility of employer's proffered reason. *Id.* Rather, it admits that the reason could motivate the employer but argues that the illegal reason is more likely than the proffered reason to have motivated the employer. *Id.* This method, however, is not identical to a *prima facie* case. *Id.* Rather, it requires the plaintiff to submit additional evidence *Id.* A plaintiff must offer evidence sufficient to allow a reasonable juror to find that the employer was motivated by illegal reasons considering both the employer's stated reasons and evidence the employer offers in support of such reasons. *Id.* at 1083; *see also Anderson*, 477 U.S. 257-58 (stating that to survive summary judgment, a party must offer sufficient evidence to allow a reasonable jury to find in his or her favor).

### b. Summary Judgment Improper Under *McDonnell Douglas*

### i. *McDonnell Douglas* Framework Applies to This Case

In this case, Plaintiff offers only indirect evidence to support his claim of retaliation. As the district court correctly noted, the only arguably direct evidence of retaliatory termination is Plaintiff's testimony regarding alleged statements of Dan Langdon. Ultimately, however, this Court

believes that Langdon's statements are indirect evidence because they require the factfinder to make an inference before finding that the termination was retaliatory. Langdon allegedly stated that Plaintiff was taking too much time off work and that absences would result in negative consequences. Langdon, however, did not directly state that taking time off would result in termination. Thus, the factfinder would have to infer that the negative consequences Langdon was referring to included termination. The necessity of this inference renders the statements indirect proof. *See DiCarlo*, 358 F.3d at 415 (holding that supervisor's statement that she fired the plaintiff for illegal reasons was direct proof and distinguishing supervisor's statement's from isolated discriminatory statements of non-supervisors who were not involved in decision to terminate the plaintiff).

Moreover, it is not clear from the record that Langdon was responsible for Plaintiff's termination. *See id.* Thus, additional evidence of Langdon's involvement is needed in conjunction with Langdon's alleged statements regarding Plaintiff's time off to allow a factfinder to reach the conclusion that Landgon terminated Plaintiff in retaliation for taking his FMLA leave. The only such evidence is indirect evidence: Langdon's participation in the meeting with Siegel. Therefore, the *McDonell Douglas* framework provides the law applicable to Plaintiff's claim.

**ii.    Plaintiff Establishes a *Prima Facie* Case For FMLA Retaliation**

Under the *McDonnell Douglas* framework, the first inquiry must be whether Plaintiff established a *prima facie* case of retaliation for exercising his rights under the FMLA. 411 U.S. at 802. The district court did not decide whether Plaintiff stated a *prima facie* claim for relief but instead assumed its existence for the purpose of the motion. The district court declined to decide

14

the issue because it determined that the only evidence of causation was temporal proximity, and thus, whether Plaintiff adequately demonstrated causation was a difficult question. The district court, however, made the issue of the existence of a *prima facie* case more difficult than necessary because the court incorrectly refused to consider Plaintiff's testimony regarding Langdon's comments. The district court refused to consider Plaintiff's testimony regarding Langdon's comments because it found that Plaintiff's sole testimony regarding the comments was in an affidavit filed after the motion for summary judgment. Relying on this Court's decision in *Reid v. Sears, Roebuck & Co.*, 790 F.3d 453, 459-60 (6th Cir. 1985),[3] the district court determined that the affidavit could not create a genuine issue of material fact because it contradicted Plaintiff's deposition testimony.

Although the district court correctly recognized that this Circuit does not consider affidavits filed after summary judgment motions if those affidavits expressly contradict earlier deposition testimony*, see id.* and *Peck v. Bridgeport Mach., Inc.*, 237 F.3d 614, 619 (6th Cir. 2001), the district court incorrectly applied this law to Plaintiff's case. In this case, Plaintiff's affidavit does not clearly contradict his earlier deposition testimony. Plaintiff's affidavit states:

> On several occasions before my termination, Mr. Langdon informed me that he and UPS management were unhappy with my taking medical and FMLA leave for my clinical depression, that such absences were considered by Mr. Langdon and UPS to

---

[3]In *Reid,* this Court held that a district court properly excluded a plaintiff's affidavit alleging that the defendant employer had assured her she would not be laid off. *Reid*, 790 F.3d at 459-60. This Court found that it contradicted the plaintiff's earlier deposition testimony that she could not remember her employer telling her anything other than that she could be fired for punching another employee's time card. *Id.* This Court reasoned that a non-moving party should not be able to create non-existent issues of fact by filing affidavits after the opposing party files for summary judgment. *Id.*

be, "problems," [sic] and that taking this time off would cause negative consequences
and would cause me to be "in trouble."

(J.A. at 144.) Similarly, in his deposition, Plaintiff made the following statements:

Q: Did you, when you returned from your disability leave in the first week of July of 2001, did anyone say anything negative to you about the fact that you've been on disability leave?

A: I guess prior you asking me [sic] if anyone said anything negative about myself or my daughter being ill.

Q: Right.

A. There were negative comments about how much time I had taken off.

Q: Who said those comments?

A: Dan Langdon.

Q: What did he say?

A: Just the fact that I was taking too much time off.

Q: And he said you would have to check into FMLA?

A: Yes.

(J.A. at 95.)

Q: Do you remember any positive or negative statements made to you by any managers or supervisors at UPS regarding the time you were taking off for your FMLA?

A: Yes, I remember Dan Langdon making comments about the amount of time that I was taking off. That I would ask for a day off or just ask him, that I needed to be off for an appointment, you know, and also when I took the initial time off, and it wasn't – I guess, what I would call a concern, it was more of a – well, you're going to have to do it through FMLA, or I just can't give you the time off now, but there's other comments made about how much time I was taking off.

16

(J.A. at 97.) Although the statements in Plaintiff's deposition are not as clear as the statement contained in Plaintiff's affidavit, the statements are not contradictory. *See King v. City of Eastpointe*, 86 Fed. Appx. 790, 793 n.1 (6th Cir. 2003 ) (unpublished) (holding that *Reid* was inapplicable where the defendant "[did] mention that the parking lot is a high crime area in his deposition, although perhaps not in as explicit terms as he does in his affidavit.") Therefore, the affidavit evidence should not have been excluded under *Reid.* Additionally, the statements in the deposition are unquestionably relevant as *Reid* does not operate to exclude deposition testimony. *See Reid*, 790 F.2d at 459-60. Consequently, this Court should consider Plaintiff's allegations regarding Langdon's negative comments.

Considering Plaintiff's affidavit, Plaintiff points to sufficient evidence to demonstrate the existence of a *prima facie* case of retaliation under the FMLA. Plaintiff exercised his right to take leave for his depression under the FMLA and was terminated three weeks after he returned from his leave. Thus, Plaintiff clearly established the first two elements of a *prima facie* case: (1) exercise of a right, and (2) adverse employment decision.

Furthermore, Plaintiff also established the third element: causal connection between the exercise of FMLA protected right and the adverse employment decision. In particular, two pieces of evidence support Plaintiff's allegation of causation: temporal proximity and the negative comments of Plaintiff's supervisor, Langdon, as testified to by Plaintiff in his deposition. Defendant began investigating Plaintiff around the time Plaintiff returned to work or approximately two months after he took his FMLA leave. Additionally, Langdon made comments to Plaintiff indicating that his absences were a problem. Because Langdon's comments combined with the temporal proximity

17

between Plaintiff's FMLA leave and termination are "sufficient to raise the inference that [the] protected activity was the likely reason for the adverse [employment] action," Plaintiff has met the burden of establishing a *prima facie* case. *Nguyen*, 229 F.3d at 566.

### ii.    Defendant Proffered Legitimate Reason for Termination

Next, under the *McDonnell Douglas* framework, Defendant must articulate a legitimate reason for Plaintiff's termination. 411 U.S. at 802. Here, Defendant argues that it terminated Plaintiff pursuant to its dishonesty policy for mailing packages without paying for them. This is a legitimate reason to terminate Plaintiff because it is legally sufficient to justify a judgment for Defendant. *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).

Furthermore, contrary to Plaintiff's contention, Defendant need not offer "proof" that Plaintiff failed to pay for the packages in order for Defendant's proffered reason for termination to qualify as legitimate. *See id.* Rather, Defendant need only point its own statements in the record articulating the reason as a basis for Plaintiff's termination. *See id.* (stating that arguments of counsel in briefs are insufficient, the reasons must be admitted into evidence). The ultimate burden of persuasion always remains with Plaintiff. *Id.* Here, the Joint Appendix contains a copy of the Dishonesty Policy, and Plaintiff admits that Defendant informed him that he was terminated pursuant to this policy at the time of his termination. Thus, Defendant has met its burden.

### iii.    No Genuine Issue of Material Fact Exists as to Pretext

Finally, because Defendant offered a legitimate reason for Plaintiff's termination, the burden is on Plaintiff to produce evidence that demonstrates pretext. 411 U.S. at 802. Plaintiff failed to produce evidence indicating that Defendant's proffered reason for his termination was pretextual,

and thus, no genuine issue of material fact exists as to whether Plaintiff's termination was retaliatory. *See id.* As discussed above, Plaintiff must offer evidence indicating either that the proffered reason was false, that it was an insufficient reason for termination, or that it was not the actual reason for termination. *Manzer*, 29 F.3d at 1084. Plaintiff does none of these things.

First, Plaintiff does not offer evidence demonstrating that the proffered reason for his termination was false. Plaintiff misses the point when he argues that Defendant cannot prove that Plaintiff did not pay for the shipments. Plaintiff must offer evidence that he paid, not point to Defendant's inability to show that he did not pay.[4] *See id.* Moreover, Defendant has adequately established that it is entitled to the protection of the "honest belief rule," under which the falsity of Defendant's reason for terminating plaintiff cannot establish pretext as a matter of law.[5] *Smith,* 155 F.3d at 806-07. An employer may invoke the honest belief rule if the employer can show that it "reasonably rel[ied] on particularized facts before it at the time the decision was made." *Id.* Here, Defendant had Siegel's investigation report before it when it decided to terminate Plaintiff. The report stated that Defendant had no record of payment on six shipments that Plaintiff made. Normally, if payment is made, Defendant's Consolidated Billing Site has a record of customer counter receipts. In this case it did not. Moreover, Plaintiff was unable to give a reasonable alternative explanation for the missing receipts when confronted. Although he found three receipts from packages the receipts were not stamped as paid, and thus, did not demonstrate that Plaintiff

---

[4]Defendant's ability or inability to prove that Plaintiff paid would, however, be relevant to the third method of demonstrating pretext, *i.e.* demonstrating that the proffered reason was not the actual reason.

[5]The honest belief rule would not prevent Plaintiff from establishing pretext through methods other than the falsity of the reason offered.

actually paid for the packages. Plaintiff's assertion that Defendant made a clerical error simply has no support in the record. Thus, Defendant's decision to terminate Plaintiff based on Mr. Siegel's report was made in reasonable reliance on particularized facts before it at the time of the decision, and Defendant is entitled to the protection of the honest belief rule. *Smith*, 155 F.3d at 806-07.

Second, Plaintiff does not produce evidence demonstrating that the proffered reason was an insufficient basis upon which to rest his termination. Plaintiff attempts to demonstrate that the "dishonesty" policy was an insufficient basis for his termination by pointing to Defendant's alleged disparate treatment of him in comparison to other employees. In particular, Plaintiff contends that: (1) UPS did not terminate other employees for shipping packages without paying for them at the time of shipment; and (2) UPS did not require other employees to produce receipts evidencing payment of packages in order to avoid termination. Even assuming that Plaintiff's contentions are correct,[6] they fail to establish that the dishonesty policy was an insufficient basis for Plaintiff's termination because neither contention is relevant to Plaintiff's termination. Plaintiff was not terminated for shipping packages and paying for them later but shipping packages without paying at all. Similarly, Plaintiff was not terminated for failing to produce receipts but because UPS records indicated that Plaintiff had not paid for packages. Defendant did not request receipts from other

---

[6]The first contention is highly suspect. Plaintiff offers several affidavits from UPS employees stating that it was common for employees to leave packages for shipment before or after the customer counter register opened. Thus, these packages might be shipped prior to payment. When employees left packages at the counter after hours, however, they generally left payment with the packages. The payment was thus simultaneous with the shipment but simply processed later when the counter opened. Only the Frost Affidavit states that employees sometimes left packages without payment. Frost later repudiated and clarified his affidavit. Frost explained that management did not pay for in house shipments, but that other employees left payment when they left their packages.

employees because there was no record of other employees failing to pay for packages. While there are records of other packages not being paid for, there is no evidence linking those records to other employees.

Third, Plaintiff did not produce evidence demonstrating that the proffered reason was not the actual reason for his termination. To meet his burden of creating a genuine issue of material fact as to pretext by the third method, Plaintiff cannot simply rely on his *prima facie* case.[7] *Manzer*, 29 F.3d at 1084. Instead, he must offer additional evidence of a causal connection sufficient to allow a reasonable jury to disbelieve Defendant's explanation for Plaintiff's termination. *Id.* at 1083-84. Plaintiff's only additional evidence of causal connection is an alleged conflict of Langdon's testimony with Mr. Siegel's testimony. In his deposition, Siegel testified that Langdon was present at the July 29, 2001 meeting regarding Plaintiff's packages. In contrast, Landgon testified that he did not recall the meeting and believes that he was on vacation around the time the decision to terminate Siegal was made. Furthermore, he expressly denied any involvement in the investigation or decision to terminate Plaintiff. Plaintiff argues that Siegal's testimony disproves that Langdon was not involved in the decision to terminate him. This Court, however, disagrees. Langdon was present at the meeting as the center supervisor. His presence does not necessarily indicate that he personally made the decision to investigate or terminate Plaintiff. It is entirely consistent with Defendant's position that Langdon was a middleman. Thus, there is no "inconsistency" indicating

---

[7]This is not to say that plaintiffs may never rely on their *prima facie* cases. Where a plaintiff's *prima facie* case is sufficiently strong to allow a reasonable jury to find that the defendant's proffered reason for termination is not the actual reason for termination, then the *prima facie* case suffices to create a genuine issue of material fact.

that Defendants are inherently unbelievable and Plaintiff fails to create a genuine issue of material fact as to pretext.

### c. Spoliation

Next, Plaintiff attempts to survive summary judgment by urging this Court to hold that Defendant's spoliation gives rise to an adverse inference that satisfies Plaintiff's burden of production under the *McDonnell Douglas* test. We reject Plaintiff's argument because the destruction of evidence made before notice of litigation does not provide this Court with any foundation to infer that the missing evidence was adverse to Defendant.[8]

A threshold question regarding spoliation is whether to apply state law or federal law. Both parties contend that state law governs spoliation issues. It is not entirely clear from the case law, however, whether state or federal law should apply.[9] Regardless of the decisional law, state or federal, this panel finds that the district court did not err in disregarding Plaintiff's allegations of spoliation.

---

[8]Defendant contends that Plaintiff waived any right to an adverse inference based on spoliation because Plaintiff did not file a motion pursuant to Federal Rule of Civil Procedure 7 with the district court. Defendant, however, addresses this argument in a perfunctory manner and fails to clarify its reasoning. Therefore, we decline to entertain it on appeal. *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999).

[9]This Court recently held "[t]he rules that apply to the spoiling of evidence and the range of appropriate sanction are defined by state law." 377 F.3d 624, 641 (6th Cir. 2004). Decision by previous panels of this court, however, might be read as suggesting a contrary rule: the pre-litigation destruction of evidence is governed by the substantive law on of the case. *See United States v. Copeland*, 321 F.3d 582 (2003) *Beil v. Lakewood Eng'g and Mfg.,* 15 F.3d 546 (6th Cir. 1994). Because the substantive choice of law does not alter the outcome of this case, the court does not find it necessary to decide this.

If this Court were to apply *Beck* and analyze the issue under Michigan law, the court would uphold the district court's decision. In *Beck*, the court applied Michigan law and found that "[s]politation is the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for the destruction." 377 F.3d at 641 The district court in the instant case found no evidence of intentional destruction of evidence, since Siegal discarded his notes in the ordinary course of business two years prior to Plaintiff's suit. The district court did not abuse its discretion.

If the court were to apply federal law, the court would reach an identical conclusion. Any adverse inference from spoliation, while not entirely dependant on bad faith, is based on the spoliator's mental state. *Nation-Wide Check Corp., Inc. v. Forest Hills*, 692 F.2d 214, 219 (1st Cir. 1992).[10] Where the spoliator has no notice of pending litigation, the destruction of evidence does not point to consciousness of a weak case. *Id.* at 218. Here, both Spiegel's notes and the tracking records were destroyed long before the advent of federal court litigation and in the course of regular business practice. Speigel threw out his notes every 60 days, and the tracking records are destroyed every 18 months. Thus, at the latest, Spiegel destroyed his notes in the fall of 2001, and the tracking records were destroyed in early 2003. Plaintiff did not initiate this lawsuit until July 2003. Consequently, UPS was not on notice that Plaintiff would need any evidence, or that the evidence could be used against it, until several months after it destroyed its records. Because UPS could not

---

[10]In spoliation claims based on federal law, this court has applied the Federal Rules of Evidence to determine the admissibility of any inferences to be drawn from such evidence. *See Copeland*, 321 F.3d at 597-99. *Nation-Wide Check Corp., Inc.* is an example of a civil case in which the First Circuit applied the Federal Rules of Evidence to the issue of what inferences may be drawn from spoliation evidence.

have known that the evidence would potentially be used against it, there is no basis from which this Court can infer that the records were adverse to UPS.

Plaintiff's argument that UPS was on notice of Plaintiff's potential use of the destroyed records because of the Union grievance proceeding in November 2001 must be rejected. The evidence available indicates that UPS's tracking records pertaining to Plaintiff's shipments were not destroyed until after the Union proceedings ended. Thus, theoretically, the records were available to Plaintiff for use during the proceedings. Because Plaintiff does not allege that Defendant prevented Plaintiff from accessing the records for the Union proceedings, there is no basis from which this Court can infer that Defendant did not want Plaintiff to use the records, and thus, that the records were adverse to Plaintiff.

Although Mr. Siegel's notes were probably destroyed before the Union proceedings, the district court's denial of an adverse inference on this basis is moot inasmuch as the inference alone is insufficient to meet Plaintiff's burden of production. As noted above the strength to be accorded an inference depends on the circumstances of the case, in particular the extent to which spoliation indicates consciousness of a weak case. *Nation-Wide Check*, 692 F.2d at 219. Although Mr. Spiegel's intentional destruction of evidence could indicate that he was believed his investigation notes would be detrimental to his employer's case, in light of other evidence in this case discussed *infra,* an inference based on spoliation of his investigation notes would not allow a rational factfinder to conclude that Defendant's reason for terminating Plaintiff was pretextual. Defendant's business records indicate that Plaintiff failed to pay for several shipments. Plaintiff is unable to show that the records were inaccurate. The investigation notes were very unlikely to contain

information that contradicted Defendant's business records because Mr. Siegal was an investigator and his work did not include recording payments. Rather, he collected information from other departments. Therefore, even if an adverse inference was warranted it could not satisfy Plaintiff's burden of production and the issue is moot.

### d. The Frost Affidavit

In light of Plaintiff's failure to meet his burden of production even with the Frost Affidavit, Defendant's motion to strike is moot. The Frost affidavit states that employees shipped packages and paid for them later. Plaintiff presumably offered it to the district court to support his attempt to rebut Defendant's proffered reason for termination, dishonesty, by showing that other employees shipped packages without paying for them at the time of shipment without being terminated. As the district court explained, however, "the key relevant aspect relating to whether [Plaintiff] was treated differently than other similarly situated employees is shipping packages without *ever* paying for them. Frost's affidavit doesn't help [Plaintiff] on this point, because Frost does not state that this ever happened. Therefore, the Court may simply disregard Frost's affidavit without striking it." (J.A. at 19.) This Court agrees with the district court's reasoning, and therefore, recommends that this Court decline to rule on Defendant's motion to strike the Frost affidavit.

## C.    ADA and PWDCRA Claims

Like Plaintiff's FMLA claims, Plaintiff's ADA and PWDCRA claims must also fail because Plaintiff fails to produce evidence sufficient to create a genuine issue of material fact as to whether Defendant's articulated reason for terminating Plaintiff was pretextual.

25

The ADA prohibits employers from discriminating against qualified individuals with disabilities. "A *prima facie* case of disability discrimination requires the plaintiff to prove that: (1) he is an individual with a disability; (2) he is otherwise qualified to perform the job requirements, with or without reasonable accommodations; and (3) he was discharged solely by reason of his handicap." *Williams v. London Util. Comm'n*, 375 F.3d 474 (6th Cir. 2004) (quotation and citation omitted). As with FMLA retaliation claims, courts apply the *McDonnell Douglas* burden shifting test. *Martin v. Barnesville Exempted Village Sch.*, 209 F.3d 931, 934 (6th Cir. 2000). Courts interpret the PWDRCA in accordance with the ADA. *Cassidy v. Detroit Edison*, 138 F.3d 629, 634 (6th Cir. 1998). Thus, the resolution of a plaintiff's ADA claims will generally resolve the plaintiff's PWDRCA claims.

Plaintiff's disability claims are even weaker than his FMLA retaliation claims. Plaintiff's sole evidence of discrimination on account of his depression, or perceptions of his depression, is temporal proximity. While, as noted in the previous section, Langdon made negative comments regarding Plaintiff's absences, Plaintiff did not allege that Langdon made negative comments about his depression. In light of Defendant's proffered reason for Plaintiff's discharge, it is very clear that temporal proximity alone cannot create a genuine issue of material fact as to whether Defendant's proffered reason for termination was pretext, and that the actual motivation was disability discrimination. *See Nguyen*, 229 F.3d 559 (stating that temporal proximity sometimes insufficient for a *prima facie* case).

**III.**
**CONCLUSION**

26

For the foregoing reasons, we **AFFIRM** the order of the district court granting Defendant's motion for summary judgment and dismissing Plaintiff's claims.